UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  08/11/2023
```

-----------------------------------------------------------------------X
                                      :

Laurien Sawicki,                      :

             Plaintiff,         :

                                          :             21-cv-2093 (LJL)

             -v-                  :

                                          :          OPINION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,      :

                                          :

             Defendant.      :

                                          :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Laurien Sawicki ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), for judicial review of the final determination of defendant Kilolo Kijakazi, Acting Commissioner of Social Security (the "Commissioner"), denying her deceased spouse, Michael Sawicki ("Sawicki") disability insurance benefits.[1]  The Commissioner moves for judgment on the pleadings pursuant to the Federal Rule of Civil Procedure 12(c), Dkt. No. 26, and Plaintiff cross-moves for judgment on the pleadings, Dkt. No. 36.

      For the following reasons, the Court denies the Commissioner's motion for judgment on the pleadings, grants Plaintiff's cross-motion for judgment on the pleadings, and remands the case to develop the record in further proceedings.

---

[1] This action was pending at the time of Sawicki's death in November 2021, at which point the Court granted Laurien Sawicki's request to be substituted as the plaintiff in this action.  Dkt. No. 20.

**BACKGROUND**

Sawicki worked in floor covering and installation until an ankle injury rendered him bedridden for six months in 2014.  Dkt. No. 10 ("R.") at 88–89, 291.  Though Sawicki returned to work after the ankle injury, he continued to be bothered by leg pain as well as by gastric issues, and ultimately stopped working in December 2015.  *Id*. at 88–89.  Sawicki claims that he suffered from numerous infirmities, including type 2 diabetes, diabetic neuropathy, depression, hypertension, and hyperlipidemia.  *Id.* at 132.  Sawicki applied for disability benefits, alleging a disability onset date beginning February 1, 2016.  *Id.* at 22.  He last met the insured status requirements of the Act on June 30, 2018 (his "Date Last Insured"), thus making February 1, 2016 through June 30, 2018 the "Relevant Time Period" for his disability claim.  *Id.* at 25, 184, 260.  He was 48 years old on his Date Last Insured.  *Id.* at 132.  He twice applied for, and was denied, disability insurance, in June and October 2019, and a hearing was held before an administrative law judge ("ALJ") in June 2020.  *Id.* at 22.  The following facts are taken from the administrative record (the "Record"), which was filed in connection with this action.  *See generally id*.  The Record contains detailed information related to Sawicki's medical history; his responses to social security disability insurance form questions; opinion evidence from state medical consultants; opinion evidence from Dr. Matthew C. Kessler, an internal medicine physician who treated Sawicki beginning in November 2018; as well as the ALJ's decision.  The Court will review this evidence in turn.

I.    **Medical Records**

The Record contains a lengthy account of Sawicki's medical history, including details on his medical diagnoses and the treatment he received from several physicians.  The Court summarizes this evidence chronologically.

A.    **Before the Relevant Time Period**

Physician notes from 2011 through 2015 reflect that Sawicki suffered from type 2 diabetes, alcohol abuse, leg pain, hyperlipidemia, hemorrhoids, depression, and neuropathic pain. *See* R. 648–53.  The earliest mention of Sawicki's diabetes in the Record dates to November 2011.  *Id.* at 877.  According to Dr. George Gorich, an internal medicine physician who treated Sawicki for at least four years before the Relevant Time Period, Sawicki's diabetes was "[u]ncontrolled" in 2015 and Sawicki was "non compliant with medical advice" with respect to his diabetes.  *Id.* at 630–31.  By September of that year, Dr. Nilo E. Herrera, an internal medicine physician who treated Sawicki in 2014 and 2015, noted that Sawicki's blood sugar had showed some improvement after treatment with insulin and Cymbalta, though Sawicki still experienced neuropathic pain in his lower extremities and he expressed concern to Dr. Herrera that the pain had not improved.  *Id.* at 403.

The treatment notes indicate that Sawicki consistently suffered right ankle and leg pain throughout this period, dating back to 2011, when Sawicki first injured his right ankle.  *See id.* at 650, 670, 810, 884.  Because of the pain in his leg, Sawicki had a difficult time moving about and bearing weight, and was prescribed Percocet.  *Id.* at 760, 799.

Besides suffering from diabetes and leg pain, Sawicki also experienced stomach pain, nausea, loss of appetite, depression, and significant weight loss during this period.  *Id*. at 110.  Dr. Herrera's notes from 2014 and 2015 state that Sawicki had high blood sugar, was taking insulin, and "appear[ed] to have some form of depression."  *See, e.g.*, *id.* at 399–400.  Dr. Herrera, during one of the visits, recommended to Sawicki that he receive psychiatric counseling.  *Id*. at 403.

3

The Record also makes clear that Sawicki suffered from alcohol addiction.  At various points in his treatment of Sawicki, Dr. Gorich noted that Sawicki drank daily, had to stop taking metaformin—a diabetes medication—due to alcohol use, and would sometimes arrive at the doctor's office inebriated.  *Id.* at 630.  In October 2015, in a follow-up appointment with Dr. Herrera, Sawicki reported that he had stopped drinking for a week after experiencing "shaking, chills, rigors and possibly pancreatitis, and that his shaking, chills, and abdominal pain resolved when he stopped drinking."  *Id.* at 410.

Lastly, both his physicians during this period noted that Sawicki was noncompliant with his medical treatment.  For example, Dr. Gorich noted in 2014 that Sawicki had "poor compliance with treatment ([h]e has not checked his blood sugar and stopped his" medication. *Id.* at 802; *see also id.* at 833("He has not check his finger stick.  He stopped insulin without discussion with MD.").  Notes from appointments with Dr. Herrera in 2014 indicate that Sawicki "admit[ted] that he drinks and smokes," and Dr. Herrera told him that "the worst thing that a person with diabetes can do is drink."  *Id.* at 399.  Dr. Herrera noted in a follow-up appointment nearly a year later that "[t]here are serious questions of [Sawicki's] compliance" and Sawicki had reported "not taking his medication since he ran out."  *Id.* at 403.

### B.      During the Relevant Time Period (February 2016–June 2018)

The only evidence in the Record from a medical provider during the Relevant Time Period are notes from an April 7, 2016 visit with family nurse practitioner ("FNP") Karen Schneider.  *See id.* at 462–66.  During this visit, Sawicki reported that he had "not felt well for a year" and that he suffered from "pins and needles" in his legs, abdominal pain, and fatigue.  *Id.* at 462.  The notes indicated that Sawicki had been prescribed Cymbalta, an insulin pen, and atorvastatin in August 2015.  *Id.* at 463.  In addition to noting that Sawicki had polyneuropathy

with type 2 diabetes, FNP Schneider reported that Sawicki drank 40 ounces of beer that day and appeared "a bit inebriated" during the visit.  *Id.* at 462.

Based on his alcohol use and the fact that Sawicki had been noncompliant with his diabetes treatment, FNP Schneider advised Sawicki that "his issues were much larger than can be taken care of in the office and he really should go to the emergency room."  *Id.* at 463.  She further noted that Sawicki was "extremely resistant" to this advice and "[did] not feel like anybody will help him."  *Id.*

### C.     After the Relevant Time Period

Dr. Kessler examined Sawicki for the first time on or around November 29, 2018.  *Id.* at 435.  Sawicki had not seen a doctor in "about 2 years" at that point, had been off all medication during that period, and had suffered from peripheral neuropathy, including "tingling/burning in the tips of his toes and difficulty walking upstairs," peripheral vascular disease, "months of gradual onset of constant moderate fatigue," sadness, depression, poor concentration, anhedonia, recent weight loss, decreased appetite, chronic pain, muscle weakness, and bilateral vision problems.  *Id.* at 435–39.  Sawicki further stated that he regurgitated his food periodically, had an experience a year prior where he vomited blood and had blood in his stool, drank three-to-four beers daily in the evenings, and smoked about one pack of cigarettes a day.  *Id.* at 437–38.

Dr. Kessler prescribed Sawicki atorvastatin for hyperlipidemia.  *Id.* at 441.  The initial treatment notes from Dr. Kessler indicate that Sawicki had "long term uncontrolled [diabetes that was] manifesting in gastroparesis causing [Sawicki's] current [abdominal] issues."  *Id.*  Notes from later appointments in 2019 reflect that Sawicki was "compliant with medication, [without] side effects," and that his diabetes and blood pressure was "under good control."  *See, e.g.*, *id.* at 490 (August 8, 2019 notes).  Following Sawicki's complaints of right leg pain, an ultrasound in

5

2019 revealed extensive right lower extremity deep venous thrombosis. *Id.* at 508. A colonoscopy from December 2019 revealed diverticulosis, a digestive condition. *Id.* at 982. Further, neurological testing in 2020 showed several neurologic deficiencies. *See id.* at 955–56. Dr. Samuel Markind, Sawicki's neurologist, prescribed Sawicki gabapentin for pain and recommended physical therapy. *Id.* at 956.

## II.   Sawicki's Testimony

Sawicki testified before the ALJ on June 22, 2020. *Id.* at 22. At the hearing, Sawicki testified that he was first diagnosed with diabetes before he stopped working in December 2015. *See id.* at 91–92. Sawicki testified that none of the medications prescribed to control his diabetes—Actoplus Met,[2] metformin, or injected insulin—helped his condition and he suffered from side effects while taking them, including "gut wrenching" pain caused by the Actopulus Met. *Id.* at 94. He stated that "It was like pipe gripping. The pains in my stomach were unbelievable . . . ." *Id.* (cleaned up). He also testified that his low blood sugar, the result of new medication, made him feel "weak, lethargic, [like he] didn't want to know anything. I didn't want to know anything. I didn't want to move like I was afraid to move." *Id.* at 95. In contrast, when his blood sugar was elevated, it "made me feel a little more in the comfort side, like my body was used to." *Id.* Sawicki further testified that his ability to walk and stand was limited, beginning around the time he began seeing Dr. Gorich, in around 2014–2015. *Id.* at 100.

When Sawicki saw Dr. Kessler in 2019, his legs were inflamed—his right leg blew up "like a balloon"—and he was unable to walk. *Id.* at 97. When asked for clarification from the ALJ as to when he started having trouble walking and standing, Sawicki stated that it had gotten

---

[2] Actoplus Met is a combination medication to control high blood sugar in people with type 2 diabetes. Dkt. No. 38 at 1–2.

progressively worse, and "back in the day"—"between 2014, 2015—"the pain was there, it's not as bad as it is now." *Id*. at 100. "[T]he numbness, the tingling, the pains, the shooting. . . . [With] diabetes I would, I would sitstill and all of a sudden like my whole body would feel this massive pain like somebody's stabbing or somebody is burning you." *Id.* at 101. Sawicki further testified that he started to have trouble sitting when he began seeing Dr. Gorich, in around 2014, and was only able to sit for 45 minutes to an hour at a time. *Id.* at 101–102. Dr. Kessler had advised him to elevate his legs to keep the swelling down. *Id.* at 104.

Sawicki testified that "I'm a hermit basically. I can't go anywhere physically 'cause I, I can't make the trek. It's hard enough for me to get up to go outside to get in the car." *Id.* at 109. As he continued, "It's hard enough for me to get out of bed in the morning. It's hard enough for me to go to the bathroom. I can't get up off the toilet. It's hard enough for me to do anything as far as even making food." *Id.* at 109–110. He testified that he had felt this way "for quite some time." *Id.* at 110. He also testified that he had problems and difficulties getting dressed and taking showers, that he used a cane (which was not prescribed), and that he does not help with the chores. *Id.* at 118–20.

### III.   Social Security Disability Benefits Forms Completed by Sawicki

On or about April 16, 2019, Sawicki completed forms related to his claims for Social Security Disability Insurance, including a work history report for receiving disability benefits. *Id.* at 311–315. In these forms, Sawicki also provided information about the extent of his daily activities. *See id.* at 316–24. The forms state that Sawicki, among other things, primarily watched TV during the day, took care of pets by feeding them and letting them outside (but needed help from his wife to do so), prepared simple meals like salads and cold cuts, shopped once or twice a week for 15–30 minutes, and drove his daughter to work daily. *Id*. at 316–20.

Sawicki's social activities were limited to texting and talking to his wife, kids, and other family members.  *Id.* at 320.  He indicated that lacked energy, often got sick to his stomach, and was "very afraid" to do anything, *id.* at 321, and he needed help lifting, pushing, and pulling items, *id*. at 319.  He stated that he could walk but it was painful, and that he could sit, kneel, and squat, but it was hard to get up.  *Id.* at 321.  In responding to questions about his pain, Sawicki stated the pain felt like "stabbing, shooting, burning, constant ill feeling, burning in stomach, numbness in legs, feet."  *Id.* at 324.  Sawicki also stated that the pain "comes and goes, feet legs 100% of the time, sometimes legs hurt more than feet, sometimes feet more than legs, constantly sick stomach pain."  *Id.*

**IV.    Opinion Evidence**

Two "Disability Determination Explanations" completed by state medical consultants in 2019 conclude that there was insufficient evidence to evaluate Sawicki's disability claim.  *See id.* at 132–39; *see also id.* at 140–49.  Both documents state that "there [was] no indication that there [was a] medical opinion from any medical sources" when evaluating the claim.  *Id.* at 137, 147.

Dr. Kessler prepared a Physical Medical Source Statement regarding Sawicki in June 2020, reporting that Sawicki had neuropathy of legs, diabetes, right leg deep vein thrombosis, and depression.  *See id.* at 1007–10.  Dr. Kessler assessed that Sawicki could stand and walk fewer than two hours a day and sit for at least six hours a day if given normal breaks; that he needed to shift positions at will from sitting, standing, or walking; that he would need to take three unscheduled one-hour breaks per working day; that he needed to elevate his leg when sitting and could occasionally lift and carry fewer than ten pounds of weight; that he could never crouch, squat, climb stairs, or climb ladders, could occasionally twist and stoop, could not reach overhead, and would need to be off task 20% of each day; and that he would need to be absent

more than four days per month.  *Id.*  In response to the form evaluation's question regarding the earliest date on which these limitations applied, Dr. Kessler stated, "2015 per [patient's statements].  I have been caring for Mike since 2018 and these symptoms have been consistent since then."  *Id.* at 1010.

## V.   The ALJ's Decision

In July 2020, the ALJ issued a decision determining that Sawicki was not disabled during the Relevant Time Period, from February 1, 2016 through June 30, 2018.  *Id.* 22–32.  The ALJ's determination was based on the required five-step sequential evaluation process.[3]  *Id.*

At step one, the ALJ found that Sawicki was not engaged in substantial gainful activity from his alleged onset date of February 1, 2016.  *Id.* at 25.  At step two, the ALJ concluded that

---

[3]A claimant's eligibility for disability benefits is evaluated pursuant to a five-step sequential analysis:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*See Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014) (Nathan, J.) (quoting *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000)); *see also* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

Sawicki had severe impairments, namely type 2 diabetes with neuropathy, hypertension, and hyperlipidemia. *Id*. At step three, the ALJ concluded that Sawicki's severe impairments did not meet or did not medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 27.

The ALJ then calculated Sawicki's residual functional capacity ("RFC") and concluded that he had the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b), except that Sawicki required "sit/stand option for 20-30 minutes having to sit down for 1-2 minutes then stand up but not being off-task; never climb ladders, ropes, scaffolds, occasionally climb stairs, ramps, balance, stoop, kneel, crouch and crawl; and avoid hazards such as unprotected heights and moving machinery." *Id*.

The ALJ explained that, in making this determination, she considered "the extent to which [Sawicki's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529[4] and [Social Security Ruling ("SSR")] 16-3p[5]" as well as "prior administrative medical findings in accordance with 20 C.F.R. § 404.1520c.[6]" *Id*. While Sawicki's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the intensity,

---

[4] 20 C.F.R. § 404.1529 provides, in relevant part: "There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain . . . and that, when considered with all of the other evidence . . . would lead to a conclusion that you are disabled."

[5] SSR 16-3p provides, in relevant part: "If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms."

[6] 20 C.F.R. § 404.1520c provides, in relevant part: "We will not defer or give any specific evidentiary weight, including controlling weight, to any . . . prior administrative medical finding(s). . . . The most important factors we consider . . . are supportability and consistency. We will articulate how we considered the medical opinions and prior administrative medical findings in your claim."

persistence, and limiting effects of the symptoms—as alleged by Sawicki—were "not entirely consistent with the medical evidence and other evidence in the record," since Sawicki's "treatment has been essentially routine and/or conservative in nature during the period at issue" and because "the overall records also show that the claimant was generally noncompliant with his diabetes treatment, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application."  *Id* at 28.

With this determination of Sawicki's RFC, the ALJ concluded at step four that Sawicki did not have the RFC to perform his past work.  *Id*. at 30.  At step five, a vocational expert (the "Vocational Expert") testified that there existed in significant numbers in the national economy jobs for a hypothetical person of Sawicki's age, education, work history, and RFC (who was also limited to sedentary work).  *Id.* at 31.  The ALJ therefore concluded that Sawicki was not disabled.  *Id*. at 32.

## PROCEDURAL HISTORY

Sawicki applied for disability benefits in April 2019, alleging that he suffered from a disability beginning on February 1, 2016 as a result of his diabetes, diabetic neuropathy, hypertension, depression, Lyme disease, and hyperlipidemia.  *Id.* at 22.  Sawicki's claim was denied twice, in June and October 2019.  *Id.*  Sawicki then requested and received a hearing before an ALJ, which was held on June 22, 2020.  *Id.*

Following the hearing, the ALJ issued a decision in July 2020 that concluded that Sawicki was not disabled and therefore not entitled to disability benefits.  *Id*. at 32.  The Appeals Council of the Social Security Administration denied review of the ALJ's decision in December 2020, thus making the ALJ's decision the final decision of the Commissioner.  *Id.* at 1–4. Following this determination, Sawicki submitted a compliant for judicial review with this Court

11

in March 2021.  Dkt. No. 1.

Sawicki passed away in November 2021.  Dkt. No. 27 at 2.  His spouse, Laurien Sawicki,
filed a motion to substitute herself for Sawicki as the plaintiff in this action, Dkt. No. 17, which
the Court granted in July 2022, Dkt. No. 20.  The Commissioner moved for judgment on the
pleadings pursuant to Federal Rule of Civil Procedure 12(c) in August 2022.  Dkt. No. 26.
Laurien Sawicki cross-moved for judgment on the pleadings in January 2023.  Dkt. No. 36.  The
Commissioner submitted a reply in support of its motion on January 31, 2023, Dkt. No. 39, and
Plaintiff submitted a reply in support of her cross-motion on February 7, 2023, Dkt. No. 40.

## LEGAL STANDARD

A United States District Court may affirm, modify, or reverse a final decision of the
Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  The reviewing court may set
aside the agency's disability determination "only where it is based upon legal error or where its
factual findings are not supported by substantial evidence."  *Rivera v. Comm'r of the Soc. Sec.
Admin.*, 2020 WL 8167136, at *12 (S.D.N.Y. Dec. 30, 2020), *report and recommendation
adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (internal quotation marks and citation
omitted).

A court reviews the ALJ's decision in two stages.  First, the Court must decide whether
the Commissioner failed to apply the correct legal standards.  "Failure to apply the correct legal
standard constitutes reversible error, including, in certain circumstances, failure to adhere to the
applicable regulations."  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting
*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)) (remanding for noncompliance with
regulations).  A court reviews the ALJ's application of legal standards *de novo*.  *See Townley v.*

*Heckler*, 748 F.2d 109, 112 (2d Cir. 1984); *Thomas v. Astrue*, 674 F. Supp. 2d 507, 530 (S.D.N.Y. 2009) (reversing for legal error after *de novo* review of the record).

Absent a finding of legal error, a reviewing court moves to the second stage of its review and considers whether the ALJ's decision was supported by substantial evidence. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) ("First, the Court reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard. . . . Next, the Court examines the record to determine if the Commissioner's conclusions are supported by substantial evidence"); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation adopted*, 2008 WL 449357 (S.D.N.Y. Oct. 01, 2008) (same). "Substantial evidence . . . 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lamay v. Comm'r of the Soc. Sec. Admin*, 562 F.3d 503, 507 (2d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In applying the substantial evidence standard, the Court "does not determine *de novo* whether [the Plaintiff] is disabled." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted). "[O]nce an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Comm'r of the Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (internal quotation marks and citation omitted). The Court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Id.* at 447; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). Where

evidence is deemed susceptible to more than one rational interpretation, the Commissioner's

conclusion must be upheld.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)

("Congress has instructed us that the factual findings of the [Commissioner], if supported by

substantial evidence, shall be conclusive.  We would be derelict in our duties if we simply paid

lip service to this rule, while shaping our holding to conform to our own interpretation of the

evidence." (internal citations omitted)).  In other words, deference must be given to the

Commissioner even if there is also substantial evidence to support a contrary finding.  *See*

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may

also adequately support contrary findings on particular issues, the ALJ's factual findings must be

given conclusive effect so long as they are supported by substantial evidence." (internal

quotation marks and citation omitted)).

　　　As the fact-finder, the ALJ need not "mention [] every item of testimony presented,"

*Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), or "'reconcile explicitly every

conflicting shred of medical testimony,'" *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)

(quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), but the ALJ must not ignore or

mischaracterize evidence of a person's alleged disability, *see Ericksson v. Comm'r of the Soc.*

*Sec. Admin.*, 557 F.3d 79, 82–84 (2d Cir. 2009).  The ALJ must discuss "crucial factors in any

determination with sufficient specificity to enable the reviewing court to decide whether the

determination is supported by substantial evidence."  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d

Cir. 1984).

## DISCUSSION

　　　Plaintiff argues that the record lacks substantial evidence to support the ALJ's

determination, Dkt. No. 38 at 10–15, and that the ALJ erred in several ways, namely, by failing

to give appropriate weight to Dr. Kessler's opinion, *id.* at 15–19, substituting her own judgment for medical opinions, *id.* at 19–21, not fully considering Sawicki's description of his pain, *id.* at 21–22, misinterpreting or misapplying the testimony of the Vocational Expert, *id.* at 22–23, and failing to adequately develop the record, *id.* at 23–24.  The Commissioner contests each of Plaintiff's arguments and contends that the ALJ's decision contains no legal error and is supported by substantial evidence.  Dkt. No. 27 at 12–18; Dkt. No. 39 at 2–12.

Plaintiff's arguments can best be characterized as claiming that the ALJ made two legal errors: (1) that the ALJ failed to adequately develop the record by not asking Sawicki questions about his noncompliance and gaps in treatment, as required by SSR 16-3p, *see* Dkt. No. 40 at 4–5; and (2) that the ALJ failed to adequately analyze the persuasiveness of Dr. Kessler's opinions, as required by 20 C.F.R. § 404.1520c(a), *see id*. at 5–7; Dkt. No. 38 at 19.

The rest of Plaintiff's claims—that Sawicki's treatment was not "routine and/or conservative;" that his daily activities were minimal, that his daily drives were for short distances, that his symptoms as they appear in Dr. Kessler's medical evidence were not "self-reported," and that the resulting RFC calculation as well as the hypothetical presented to the Vocational Expert were incorrect—all pertain to ALJ findings of fact.  As such, a reviewing court must consider whether these findings were supported by substantial evidence, only if it finds that the ALJ committed no legal error.  *See Brault*, 683 F.3d at 448.

The Court reviews the ALJ's decision for legal error *before* applying the substantial evidence standard.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987); *see Ulloa v. Colvin,* 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) ("The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.").  Accordingly, the Court

reviews the two alleged legal errors first.  Finding that the ALJ committed legal error, the Court does not analyze the sufficiency of the evidence supporting the ALJ's findings of fact.

## I.      The ALJ Failed to Follow SSR 16-3p

The ALJ has a general duty to fully develop the factual record in a proceeding.  "Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

Plaintiff argues that the ALJ committed legal error by not fully developing the record. *See generally* Dkt. No. 38.  In particular, Plaintiff argues that the ALJ did not fully develop the record by holding Sawicki's non-compliance and gaps in treatment against him without first inquiring into or considering possible explanations for such noncompliance or treatment gaps. Dkt. No. 40 at 5–6.  The Commissioner does not directly respond to Plaintiff's argument, instead stating that "it was reasonable for the ALJ to consider the evidence of Sawicki's non-compliance with medication."  Dkt. No. 39 at 5.

This Court agrees with Plaintiff that the ALJ's failure to inquire into and develop evidence with respect to Sawicki's non-compliance and the gaps in his treatment was in error. SSR 16-3p requires the ALJ to consider possible explanations for non-compliance and treatment gaps before using that evidence in a disability determination.  The relevant text of the Ruling states:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.  We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without

considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.  We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017).  Plaintiff argues that "failing to comply with [this] regulation[] alone" warrants a remand.  Dkt. No. 40 at 6.[7]

SSRs do not carry the force of law or regulations, but they are still "binding on all components of the Social Security Administration" in accordance with Section 402.35(b)(1) of the Social Security Administration Regulations, and "represent precedent final opinions and orders."  20 C.F.R. § 402.35(b)(1); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990) (same); *Clark v. Berryhill*, 697 F. App'x 49, 50 n.2 (2d Cir. 2017) (same).  ALJs are thus required to follow SSRs in disability determinations and courts in this District have remanded Social Security decisions for legal error based on violations of SSRs.  *See Cooper v. Saul*, 444 F. Supp. 3d 565, 581 (S.D.N.Y. Mar. 12, 2020) (remanding because the ALJ failed to follow SSR 16-3p); *see also Felicie v. Apfel*, 1998 WL 171460, at *4 (S.D.N.Y. Apr. 13, 1998) ("The ALJ's failure to follow SSR 83-20 constitutes legal error.").

In this case, Sawicki's history of noncompliance and gaps in treatment were among the primary reasons cited by the ALJ in her assessment of Sawicki's testimony about his symptoms and her decision to deny Sawicki disability benefits.  *See* R. 28.  In particular, the ALJ stated that Sawicki's repeated noncompliance "suggest[ed] that the symptoms [of his impairments] may not

---

[7] Plaintiff also argues that the ALJ erred by violating SSR 18-3p, 2018 WL 4945641 (Oct. 2, 2018).  *See* Dkt. No. 40 at 6.  However, SSR 18-3p in inapplicable because "this is not a situation where [the] ALJ [] determined that Plaintiff would 'otherwise be entitled to benefits based on disability' and then denied him benefits for failing to follow prescribed treatment."  *Darcy v. Comm'r of Soc. Sec.*, 2023 WL 2035945, at *5 (E.D.N.Y. Feb. 16, 2023) (quoting SSR 18-3p); *see also* SSR 18-3p, 2018 WL 4945641, at *2 (noting that a prerequisite for applying the SSR is that "[t]he individual is otherwise entitled to disability [benefits]").

have been as limiting as the claimant ha[d] alleged in connection with this application." *Id*. Further, the ALJ noted that "the overall medical records show only conservative measures such as medications for his depression and anxiety and no actual psychiatric therapy treatments." *Id*. at 25. The ALJ's decision does not mention any possible explanations for why that might have been, nor did the ALJ ask Sawicki for his explanations during the hearing.[8]

The text of the SSR 16-3p, its status as a binding agency ruling, as well as prior case law on this issue support the claim that the ALJ's failure to comply with SSR 16-3p constitutes legal error. Previous courts have recognized that "a person who suffers from psychological and emotional difficulties may lack the rationality to decide whether to continue treatment or medication.'" *Cooper*, 444 F. Supp. 3d at 580 (quoting *Williams v. Colvin*, 2016 WL 4257560, at *3 (W.D.N.Y. Aug. 12, 2016)). Here, Sawicki had documented problems with depression and alcohol abuse,[9] suggesting that an inquiry into the reasons why Sawicki did not seek treatment during the Relevant Time Period could have uncovered material information.

The Commissioner responds by arguing that, even if there was legal error in this regard, "[Sawicki's] non-compliance constituted one of many factors that the ALJ discussed in evaluating the RFC and [Sawicki's] subjective allegations" and that "the Court should still

---

[8] The ALJ asked Sawicki about his alcohol use, and Sawicki assured the ALJ that he was "drinking socially . . . not abusing alcohol." *See* R. 117. The ALJ also asked Sawicki about the time he wasn't "taking [his] medications related to diabetes," to which Sawicki responded by saying that Actoplus Met and insulin were "too much" and that he "didn't like the medications [but] found the right doctor [eventually]." *Id*. But there was no further explanation requested regarding the treatment gaps or "repeated" instances of noncompliance.

[9] The ALJ found that "the claimant's medically determinable mental impairments of depressive disorder and alcohol abuse, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere." R. 25. However, the ALJ did not make a finding as to what effect, if any, Sawicki's alcohol use and psychological order had on his decisions to seek treatment or adhere to his medication regimen.

uphold the ALJ's assessment of [Sawicki's] allegations, as the ALJ's overall analysis was supported by substantial evidence." Dkt. No. 39 at 5. The Commissioner cites several cases to support the proposition that a court finding legal error can still uphold an ALJ's decision if the ALJ's analysis is based on substantial evidence. *Id.* But the three cases cited by the Commissioner are all distinguishable. First, *Jones v. Berryhill*, 415 F. Supp. 3d 401, 421–22 (S.D.N.Y. 2019), did not involve an ALJ's violation of a binding agency ruling. Rather, the court assumed that the ALJ erred in concluding that the claimant was looking for full-time work when he reported that he had been searching for a "wide range of work" but then concluded that such error was "harmless . . . as the record as a whole provide[d] ample evidence" to support the ALJ's credibility findings. In *Kuchenmeister v. Berryhill*, 2018 WL 526547 (S.D.N.Y. Jan. 19, 2018), the court found that the ALJ erred because he failed to "consider[] any explanation plaintiff might have offered for failing to attend approximately 14 therapy appointments between January 2012 and December 2014, nor does the objective record shed light upon the reasons for plaintiff's inconsistent attendance at sessions." *Id.* at *19. But the court concluded that the error was harmless because the "objective record supports [the] ALJ['s] credibility assessment, including findings that plaintiff was able to attend weekly group support meetings and maintained a small but close support network with whom he interacted regularly, which undercut plaintiff's claims regarding the constraining nature of his mental impairments." *Id.* Here, not only does the Record not reflect the reasons why Sawicki might not have adhered to his treatment regimen or attended appointments because those questions were not asked, but there is also no similar evidence in the record that might undermine any claims Sawicki might have made justifying his noncompliance with medical treatment.

Finally, in *Snyder v. Colvin*, 667 F. App'x 319 (2d Cir. 2016), the Second Circuit found that found that the ALJ's error "in not considering the reasons why the plaintiff did not seek formal mental health treatment" was harmless.  *Id.* at 320.  There, however, the plaintiff's "lack of formal health treatment was just one of multiple factors considered in assessing the plaintiff's credibility," which "was supported by other substantial record evidence," including directly conflicting evidence from a consulting psychiatrist.  *Id.*  Specifically, the ALJ "analyzed Snyder's claims of neck pain, arm numbness, obesity, and depression; as to each condition, the ALJ cited specific medical evidence in the record and concluded that the alleged limitations were without support."  *Id.*  Here, the ALJ did make findings that went to her evaluation of Sawicki's symptoms:  She found that (1) "the medical record . . . shows only routine treatments for [Sawicki's] hyperlipidemia and hypertension"; (2) "the medical records . . . do not corroborate . . . allegations [of side effects from the use of medications] during the period at issue"; (3) "the medical records do not corroborate" Sawicki's use of a cane or indicate "that a cane was prescribed by a medical professional"; and (4) Sawicki "described engaging in daily activities, which are not limited to the extent one would expect given his complains of disabling symptoms and limitations."  R. 28–29.

However, unlike in *Snyder*, the ALJ did not specifically analyze Sawicki's conditions individually or rely on any medical opinion evidence to bolster her evaluation of Sawicki's symptoms.  Social Security Ruling 16-3p states, "[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."  2017 WL 5180304, at *5.  Two of the four facts that the ALJ pointed to in questioning Sawicki's testimony about his symptoms were the lack of medical evidence,

20

which arguably was exacerbated by the gap in his treatment.  The remaining factors, Sawicki's

engagement in daily activities and the "routine" nature of his treatment, lacked the specificity

required for the Court to assess the ALJ's determination.  *See Rockwood v. Astrue*, 614 F. Supp.

2d 252, 270 (N.D.N.Y. 2009) ("When rejecting subjective complaints, an ALJ must do so

'explicitly and with sufficient specificity to enable the Court to decide whether there are

legitimate reasons for the ALJ's disbelief.'" (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608

(S.D.N.Y.1987))).  The ALJ mentioned Sawicki's daily activities without referencing Sawicki's

self-reported pain and symptoms and without detailing how engagement in these activities

undermined these symptoms.  Finally, the ALJ did not cite to specific parts of the Record to

support the conclusion that Sawicki's treatment was "routine."  The Court thus finds that the

ALJ's legal error was not rendered harmless because the ALJ's evaluation of Sawicki's

symptoms was otherwise supported by substantial evidence, like it was in *Snyder*.[10]

The ALJ's failure to follow SSR 16-3p therefore does not constitute harmless error where

the "application of the correct legal principles to the record could lead only to the same

conclusion."  *Jacqueline O. v. Comm'r of Soc. Sec.*, 2022 WL 4463845, at *3 (S.D.N.Y. Sep. 26,

2022).  It is legal error, sufficient to warrant a remand.

## II.    The ALJ Failed to Adequately Analyze the Persuasiveness of Dr. Kessler's Opinion

Prior to March 27, 2017, ALJs were allowed to give the medical opinion of a claimant's

treating physician controlling weight in the analysis.  *See* 20 C.F.R. §§ 404.1527, 416.927 (both

sections noting applicability only to "claims filed before March 27, 2017"); *Prieto v. Comm'r of*

---

[10] Further, the ALJ dismissed the opinion of Dr. Kessler, whose Physical Medical Source Statement explicitly stated that Sawicki used "a cane or other hand-held assistive device" while standing or walking.  R. 1009.  Importantly, this failure to adequately analyze Dr. Kessler's opinion was legal error, discussed in more detail below.  *See infra* Section II.

*Soc. Sec.*, 2021 WL 3475625, at *8 (S.D.N.Y. Aug. 6, 2021) ("Until recently, regulations required application of the so-called 'treating physician rule' pursuant to which the opinion of a claimant's treating physician presumptively was entitled to 'controlling weight.'" (quoting 20 C.F.R. § 404.1527(c)(2))).  Under the new regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a).  Instead, the new rule requires the ALJ to consider medical opinions using the five factors specified in Section 404.1520c—namely: "(i) its '[s]upportability'; (ii) its '[c]onsistency'; (iii) the '[r]elationship' between the medical source and the claimant; (iv) the source's '[s]pecialization' in a relevant medical field; and (v) 'other factors that tend to support or contradict' the opinion or finding"—and to articulate "how persuasive" the ALJ deemed each opinion.  *Betancourt-Algarin v. Kijakazi*, 2022 WL 5176862, at *9–10 (S.D.N.Y. Aug 5, 2022) (quoting 20 C.F.R. § 404.1520c(c)).  The "most important factors" to be considered in evaluating the persuasiveness of medical opinions are "supportability" (through a discussion of the relevance of the objective medical evidence) and "consistency" (through a comparison of the medical opinion and evidence from other medical and nonmedical sources in the file).  20 C.F.R. § 404.1520c(b)(2).  The ALJ's decision must explain how the ALJ treated those two factors.  *Id.*; *Vellone v. Saul*, 2021 WL 319354, at *6 (S.D.N.Y. Jan 29. 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("[I]n cases where the new regulations apply, an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion." (emphasis in original)).  An ALJ may, but is not required to, explain how he or she considered factors other than supportability and consistency, as appropriate.  *See* 20 C.F.R. § 404.1520c(b)(2).

On the "supportability" prong, the ALJ found Dr. Kessler's opinions unpersuasive because they were based on "self-reported symptoms of the claimant," because Dr. Kessler "did not have a treating relationship with the claimant during the period at issue" and because "his opinion [was] unsupported by the medical evidence during the period at issue."  R. 29–30.  The ALJ's "supportability" analysis is deficient.  When there does not exist substantial medical evidence from the relevant period, as is the case here, the ALJ cannot disregard retrospective medical assessments.  *See Zaida B. v. Comm'r of Soc. Sec.*, 2022 WL 3867523, at *5 (S.D.N.Y. June 1, 2022), *report and recommendation adopted*, 2022 WL 3867903 (S.D.N.Y. Aug. 30, 2022) ("It is error for an ALJ to concentrate on the absence of a treating or examining medical opinion from the relevant period without exploring the possibility of retrospective diagnosis and assessment."); *Lucas v. Barnhart*, 160 F. App'x 69, 71 (2d Cir. 2005) ("A retrospective diagnosis, made as many as several years after an onset, must nonetheless be granted 'significant weight' by the ALJ" (quoting *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981))).  The ALJ did not explain how Dr. Kessler's opinion was "unsupported by the medical evidence," beyond stating that Sawicki's symptoms were "self-reported," which, by itself, does not constitute an adequate analysis.  *See Daniels v. Kijakazi*, 617 F. Supp. 3d 180, 192–93 (S.D.N.Y. 2022) (remanding because the ALJ did not adequately explain why plaintiff's self-reported symptoms were inconsistent with the medical evidence beyond providing a "neutral summary of the various medical opinions in the record followed by only the briefest analysis of each opinion"); *Dixon v. Berryhill*, 2017 WL 3172849, at *15 (S.D.N.Y. July 26, 2017) ("When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that 'decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and

23

any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.'" (quoting SSR 16-3p)). Plaintiff correctly points out that symptoms are often necessarily subjective and self-reported and that parts of Dr. Kessler's opinions, such as the description of "leg swelling" were based on objective observations. Dkt. No. 38 at 18. The ALJ thus failed to adequately analyze Dr. Kessler's opinion under the supportability prong.

Additionally, the ALJ violated the requirements of 20 C.F.R. § 404.1520c(b)(2) by offering no explanation at all for how she evaluated Dr. Kessler's opinion for consistency with evidence from other medical and nonmedical sources in the Record. "[T]he new rules provide that the greater the consistency between a particular medical source/opinion and the other evidence in the medical record, the stronger that medical opinion becomes. Consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record, not just what a medical source had available to them." *Acosta Cuevas v. Comm'r of Soc. Sec.*, 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022); *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3). Sawicki's long medical history of ankle and leg pain, hypertension, uncontrolled diabetes with neuropathy, alcohol abuse, and depression could be consistent with Dr. Kessler's opinions that Sawicki "[could] stand/walk less than 2 hours," "sit for at least 6 hours," "need[ed] to elevate his legs," and "ha[d] good and bad days." R. 29. This medical history could also be inconsistent with Dr. Kessler's opinions. The legal error is that the ALJ did not address the issue. *See Acosta Cuevas*, 2021 WL 363682, at *15 (finding that the ALJ's consistency analysis was insufficient because the ALJ ignored medical evidence, such as clinic notes from a mental health facility, that could have otherwise been consistent with plaintiff's testimony about her mental impairments). And because, for example, it is not

24

apparent from the Record that these opinions are necessarily inconsistent with Sawicki's medical history and might have altered the RFC if properly considered, this error was not harmless. *See Conklin v. Kijakazi*, 2023 WL 104829, at *14 (S.D.N.Y. Jan. 5, 2023) (finding, under the new regulations, that "[t]he failure to properly assess [consultative psychiatric examiner's] evaluation was 'not harmless error' because '[h]ad the ALJ incorporated [these] . . . assessments in the RFC, the ALJ would have devised a different RFC determination" (third and fourth alterations in original) (citation omitted)).

Failure to offer any explanation as to how these factors were considered in the ALJ's consistency analysis, as well as failing to adequately explain her supportability analysis, are sufficient legal errors to warrant remand, especially in a case like this where it is unclear that substantial evidence exists to make the errors harmless. *See McIntosh v. Kijakazi*, 2022 WL 2384151, at *4 (S.D.N.Y. July 1, 2022) ("Because the ALJ failed to address the supportability or consistency of Dr. Etemadi's medical opinions, and it was not harmless error, remand is warranted."); *Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (summary order) (remanding because "the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record" and because "we cannot conclude that the ALJ's procedural error was harmless"); *Acosta Cuevas*, 2021 WL 363682, at *15 (finding legal error and remanding because the ALJ failed to address the supportability factor, and because the ALJ's consistency analysis was insufficient).[11]

---

[11] The ALJ committed legal errors by failing to follow SSR 16-3p and failing to adequately analyze the persuasiveness of Dr. Kessler's opinion under 20 C.F.R. § 404.1520c.  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986; *see also Ellington v. Astrue*, 641 F.

### III.     Remand Is the Appropriate Remedy

If a decision denying benefits is not based on the correct legal standards, the court may modify, or reverse the Commissioner's decision, with or without remand.  42 U.S.C. § 405(g); *see Acosta Cuevas*, 2021 WL 363682, at *17 (remanding "pursuant to sentence four of 42 U.S.C. § 405(g) for additional proceedings in which the proper legal standards will be applied to Plaintiff's claims" after a finding of legal error).  The Commissioner argues that "[even] if remand were warranted, ordering an award of benefits would not be appropriate."  Dkt. No. 39 at 11.  Plaintiff maintains that benefits would be the appropriate remedy since the original claimant in this case is no longer alive and would not be able to testify on remand.  Dkt. No. 40 at 10.  In the alternative, Plaintiff requests that the Court remand to develop the record.  *Id*.

It is well settled under Second Circuit precedent that a court should remand solely to order payment of benefits only in the rare circumstance in which "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *see Sczepanski v. Saul*, 946 F.3d 152, 161 (2d Cir 2020) ("Such a remedy is appropriate where there is no apparent basis to conclude that a more complete record might support the Commissioner's decision.").  For these circumstances to

---

Supp. 2d 322, 328 (S.D.N.Y. 2009) ("Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision.").  Thus, it is unnecessary for the Court to consider whether the Commissioner's final decision is also supported by substantial evidence.  *See Navedo v. Kijakazi*, 616 F. Supp. 3d 332, 342 (S.D.N.Y. 2022) ("Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), 'the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record.'" (quoting *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *Johnson*, 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.").

be met, a finding of legal error or gaps in the record is not enough.  *See Suarez v. Colvin*, 2014 WL 5099207, at *14 (S.D.N.Y. Oct. 1, 2014) ("[W]here there are simply 'gaps in the administrative record or the ALJ has applied an improper legal standard', remand 'for further development of evidence' is the appropriate course of action." (quoting *Parker*, 626 F.2d at 235)).  Indeed, many of the Plaintiff's claims—such as the ALJ's failure to ask Sawicki about the extent of his driving or to inquire about reasons for gaps in his treatment—call for *further development* of the record, which is inconsistent with a conclusion that the record as it stands inescapably establishes a finding of disability.  *See Del Pilar v. Sullivan*, 756 F. Supp. 117, 199 (S.D.N.Y. 1990) (remand for further development of record is not required "where application of correct legal principles to the record could lead to only one conclusion, that is, that plaintiff is disabled as defined by agency regulations." (citing *Murdaugh v. Secretary of Dep't of Health & Human Services*, 837 F.2d 99, 102 (2d Cir.1988))).

The role of a reviewing court is limited in scope in situations such as these:  It is the ALJ, as the factfinder, who must ultimately develop the record, apply the correct standards, re-weigh the evidence on remand, and determine the new RFC, if any.  *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (The ALJ, as the fact-finder, is "entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.").  Though the original claimant will not be able to testify on remand, the administrative record may still be developed through clarification of facts known to other parties about Sawicki's daily activities or testimony from his physicians.  The Plaintiff's own statement implies that it is possible to "better develop the record" on remand even absent testimony from the original claimant.  *See* Dkt. No. 40 at 10.

27

The Court thus believes that remanding for calculation of benefits is not warranted at this stage, and that the matter should instead be remanded to further develop the Record and apply the proper legal standards.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is DENIED and Plaintiff's cross-motion for judgment on the pleadings is GRANTED.  This case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for additional proceedings to further develop the Record and apply the proper legal standards.

The Clerk of Court is respectfully directed to close Dkt. Nos. 26, 36 and to remand this case.


SO ORDERED.

Dated: August 11, 2023
     New York, New York

LEWIS J. LIMAN
United States District Judge